[No. A134405. First Dist., Div. Five. Feb. 19, 2013.]

SAN FRANCISCO UNIFIED SCHOOL DISTRICT ex rel. MANUEL CONTRERAS et al., Plaintiffs and Appellants, v.
FIRST STUDENT, INC., Defendant and Respondent.

1214

## COUNSEL

Baron & Budd, Thomas M. Sims, Laura J. Baughman; Law Office of April Strauss, April M. Strauss; James R. Wheaton and Lynne R. Saxton for Plaintiffs and Appellants.

Reed Smith, Jesse L. Miller, Dennis P. Maio, James M. Neudecker and Matthew T. Peters for Defendants and Respondents.

## OPINION

**BRUINIERS, J.**—In this action brought under the False Claims Act (Gov. Code, § 12650 et seq.),[1] the qui tam plaintiffs allege that defendant Laidlaw Transit, Inc. (Laidlaw), and its successor in interest, First Student, Inc. (FSI), failed to maintain and repair the company's buses as required by the company's contract with San Francisco Unified School District (SFUSD). At issue here is an injunction issued by the trial court barring the individual plaintiffs, former employees of Laidlaw, from discussing the lawsuit with any current employees of FSI.

The individual plaintiffs challenge the injunction, arguing it is unsupported by the State Bar Rules of Professional Conduct barring ex parte communication with represented parties (Rules Prof. Conduct, rule 2-100),[2] is inconsistent with the policies underlying the False Claims Act, and infringes on their First Amendment rights of free speech. We vacate the injunction.

### I. BACKGROUND

We described the background of this case in our opinion in a prior appeal: "Plaintiffs [William] Padilla and [Manuel] Contreras are former Laidlaw

---

[1] All statutory references are to the Government Code unless otherwise indicated.

[2] All rule references are to the State Bar Rules of Professional Conduct unless otherwise indicated.

employees. Plaintiff Environmental Law Foundation is a California nonprofit organization 'dedicated to the preservation and enhancement of human health and the environment.' In May 2007, plaintiffs filed a complaint against Laidlaw alleging violations of the [False Claims Act]. As required by the [False Claims Act], the complaint was filed in camera and under seal to allow [SFUSD] to investigate and potentially intervene in the action. (See § 12652, subd. (c).) On January 28, 2008, [SFUSD] filed a notice that it was declining to intervene, and the trial court lifted the seal.

"In July 2008, plaintiffs filed their second amended and operative complaint (Complaint), seeking damages and civil penalties on behalf of [SFUSD] for false claims, records, and statements presented by Laidlaw in violation of the [False Claims Act]. (§ 12651, subds. (a)(1), (2) & (7).) Plaintiffs also sought for themselves an award of a portion of the damages and penalties, as well as payment of their attorney fees, expenses, and costs of suit.

"According to the Complaint, Laidlaw has for a number of years provided bus transportation services under a series of contracts with [SFUSD]. The Complaint describes certain requirements imposed on Laidlaw in the contract effective between August 16, 2005, and August 15, 2010 (Contract). Those requirements include provisions that Laidlaw: (1) provide school buses meeting state and federal standards relating to pupil transportation; (2) maintain its buses in ' "excellent mechanical condition and appearance" ' and replace all vehicles ' "which are deemed to be unfit for providing the required service" '; (3) maintain an extra 10 percent of each type of bus as a spare fleet; (4) provide buses meeting or exceeding specified state and federal safety standards; (5) provide buses meeting a specified particulate matter emissions standard or equipped with a specified emission control device and diesel buses with a ' "closed crankcase emission control system" '; (6) not authorize ' "overnight park-out" ' of any buses without prior authorization; and (7) employ a ' "Fleet Maintenance Supervisor" ' to ' "establish and maintain a complete and effective preventative maintenance program with complete and accurate records on each vehicle." ' Each of those provisions is a material term of the Contract. [SFUSD] agreed to provide payment on a monthly basis 'for services satisfactorily performed by [Laidlaw] after receipt of properly documented invoices.'

"The Complaint further alleges that 'Laidlaw has been in breach of one or more of these material terms throughout the term of the Contract and at the time Laidlaw has presented invoices, claims or demands for payment to [SFUSD].' The Complaint contains numerous specific allegations describing how the buses utilized by Laidlaw were in inadequate and/or unsafe operating condition and failed to meet the pollution control requirements in the Contract. . . .

"The Complaint's first cause of action alleges that Laidlaw violated section 12651, subdivision (a)(1), by knowingly presenting false 'claims' to [SFUSD] for payment or approval. It asserts, '[w]hen Laidlaw submitted monthly invoices for payment, [it] impliedly certified that [it] had met each and every material term of the [C]ontract.' . . ." (*San Francisco Unified School Dist. ex rel. Contreras v. Laidlaw Transit, Inc.* (2010) 182 Cal.App.4th 438, 442–444 [106 Cal.Rptr.3d 84], fn. omitted (*SFUSD*).)

In *SFUSD*, we reversed a trial court order sustaining a demurrer to the first cause of action and a subsequent dismissal. (*SFUSD, supra,* 182 Cal.App.4th at pp. 444, fn. 6, 458.) In this February 2010 opinion, we held that Laidlaw's submission of invoices to SFUSD impliedly certified that Laidlaw had complied with express and material contract terms. (*Id.* at p. 442.) The allegations that it submitted those invoices knowing it had not complied with those express and material contract terms, therefore, stated a cause of action for filing a false claim for payment in violation of section 12651, subdivision (a)(1). (*SFUSD,* at pp. 442, 458.) On remand, FSI answered the complaint as a successor in interest to Laidlaw.

### A. First Application for Preliminary Injunction

On June 1, 2011, Alise M. Cappel (an Environmental Law Foundation (ELF)) investigator who was testifying as ELF's person most qualified to testify on certain subjects) stated at her deposition that, in 2010 and 2011, she had interviewed certain then current FSI employees about the False Claims Act matter. On the advice of counsel, who raised a work product privilege objection, she declined to identify those employees. ELF later responded to FSI discovery requests with a list of 67 FSI employees who might have knowledge relevant to the lawsuit.

In a letter to plaintiffs' counsel dated June 7, 2011, FSI's attorneys "demand[ed] that ELF, its employees and counsel, as well as counsel for the other *qui tam* plaintiffs, immediately cease and refrain from communicating with [FSI's] employees. Pursuant to Rule 2-100 . . . , [FSI's] employees may not be interviewed without the consent of counsel."

On July 19, 2011, FSI applied ex parte for a temporary restraining order and order to show cause regarding issuance of a preliminary injunction prohibiting ELF and its attorney from communicating with FSI employees outside the presence of FSI's attorneys or using any information it had obtained in such communications. The court issued the temporary restraining order, ordered briefing, and set a hearing for August 2.

Both sides submitted sworn declarations. In a July 14, 2011 declaration, drafted during a meeting with FSI's counsel, FSI mechanic Mahendra Lal

described a meeting he had attended with plaintiffs and their counsel in March 2011. Lal averred that he had worked with Contreras at Laidlaw/FSI for years. In about March 2011, Contreras called Lal and asked him to meet with Jim Wheaton, an attorney who had handled an earlier Proposition 65 environmental case ELF had brought against Laidlaw. Lal met with Wheaton in a San Bruno restaurant in March 2011. Cappel, Padilla and Contreras were also present. Neither Wheaton nor Cappel asked Lal if he had a lawyer, if "it was ok to speak with" him, or if he held a management position with the company. They did not disclose that they were suing FSI, that FSI had counsel, that Lal could refuse to speak to them, or that Lal could consult an attorney or his union before speaking to them. Wheaton falsely told Lal the Proposition 65 case was still pending, and Contreras and Padilla were not seeking any money from the instant case. Wheaton asked Lal about "whether [FSI's] buses were 'smoking,' pollution warnings, [his] job duties, staffing levels in the shop, the company's computer systems, and whether the mechanics were working overtime." Wheaton also asked whether Lal had done anything wrong while working for Laidlaw or FSI. Lal felt uncomfortable and later concluded "they were trying to trick me into making statements against my own interests and to hurt my employer in their current case against it."

Contreras, in a July 24, 2011 declaration, averred that he remained on friendly terms with many current FSI employees and that the subject of work often came up in their conversations, including employees' complaints about the company. Contreras called Lal in early 2011 and they spoke about work. Because Lal "seemed to think the company could be doing a better job," Contreras asked if Lal wanted to talk to his lawyer and Lal said he did. Lal met with Wheaton, Cappel, Padilla and Contreras at a San Bruno restaurant. Just before the meeting started, Lal joked with Contreras that he should hide so no one from the company would see him.[3]

Wheaton averred that either Contreras or Padilla invited him to meet with Lal in or about March 2011. They met at a San Bruno restaurant and Cappel, Contreras and Padilla were present. Wheaton asked Lal if he had an attorney, and Lal said he did not and did not feel he needed one. Wheaton asked if Lal had spoken to management about getting permission to speak to him, and Lal said he did not and he would not because he feared retaliation. Wheaton asked Lal about his job duties to determine if he was a management employee and concluded that he was not. Wheaton told Lal that the False Claims Act provided some protection if Lal suffered retaliation for providing information and that Lal could contact him if he suffered any adverse action. Wheaton also told Lal the Proposition 65 lawsuit had settled but was still

---

[3] Contreras's July 2011 deposition testimony on his contacts with Lal was substantially similar to his declaration.

ongoing because Laidlaw had agreed to a multiyear remedial plan, and that ELF, Contreras and Padilla had brought the False Claims Act lawsuit against Laidlaw not "for personal gain like a personal injury case. Rather, their mutual goal was to change Laidlaw practices and policies to make sure that buses were clean and safe" and most of the money recovered would go to SFUSD. Wheaton then asked Lal about what he had observed regarding bus maintenance and repair at Laidlaw/FSI. He "never asked Mr. Lal whether he had done anything wrong himself. Such a question would be disruptive and destroy any trust with a witness who is not a client. I did ask him whether the company had ever asked him to do anything wrong, as we had heard allegations that mechanics had been ordered to falsify inspection reports, and falsify whether repairs on inspection reports had in fact been performed. I also asked him whether he knew whether any other mechanic had been told to or had falsified either inspection or repair records. His answer was succinct: if it happened you'll never be able to prove it because there won't be any record of it, nor any documents that contradict a falsified record."

Regarding Cappel's interviews with FSI employees other than Lal, Wheaton averred that he "instructed Ms. Cappel to start every conversation with an employee . . . with an inquiry into whether the individual had any managerial responsibilities or authority for company policies. If the answer was anything other than an unequivocal no the interview had to be terminated. [Otherwise], employees could be interviewed about what they saw, heard or were told to do, but not about anything they had done that could be wrong. This latter instruction was both to follow [rule 2-100] and also to prevent any possibility that an employee was—or felt they were—being asked to admit any personal wrongdoing." Cappel confirmed that Wheaton had instructed her not to ask employees whether they had personally done anything wrong.

Padilla's and Cappel's declarations about the meeting with Lal were similar to Wheaton's. Both Contreras and Padilla, who each had known and worked with Lal for years, averred that Lal was forthcoming during the meeting and did not appear to be uncomfortable.

Contreras averred that, in mid-July 2011, Lal left him a phone message asking him to call. When they spoke, Lal said he had been pulled into a meeting at work with an FSI lawyer and asked to sign a paper, which he signed without reading it. Sometime later, Lal called him again and "expressed his frustration that [Contreras] had placed him in 'the middle of this shit.' "

In a reply declaration filed August 2, 2011, Lal denied that he told Contreras he was forced to sign a declaration. Lal spoke to Contreras on the phone in July 2011 before his July 14 meeting with FSI's attorney and before

he signed the declaration, and he said he was upset that Contreras had broken a promise to keep his meeting with plaintiffs' attorney private. Lal further averred that he had asked to meet with FSI's counsel, that the July 14 declaration was based on his statements, and that he had had time to read the declaration before he signed it. Lal wrote, "I just want Mr. Contreras and Mr. Padilla and their lawyers to leave me alone and stop contacting me. I told them my company has lawyers and I do not want to talk with them unless my company's lawyers are present." The FSI lawyer and paralegal who attended the July 14 meeting with Lal averred that they observed Lal read his July 14 declaration before he signed it.

FSI argued that ELF and its attorneys violated rule 2-100[4] by interviewing Lal, a current FSI mechanic whose "act[s] or omission[s] . . . in connection with the [lawsuit] . . . may be binding upon or imputed to the organization for purposes of civil . . . liability"; that they violated other ethical obligations because they used misrepresentations to entice Lal to speak with them (see Bus. & Prof. Code, § 6068); and that they improperly sought disclosure of trade secrets and attorney-client communications. On the rule 2-100 question, they cited Lal's statement that Wheaton specifically asked him if he had done anything wrong. However, even under Wheaton's account of the meeting, FSI argued, plaintiffs' counsel simply "cleverly phras[ed] questions that elicit[ed] the type of information Rule 2-100 is designed to protect, while appearing proper on the surface."

Plaintiffs denied that they or their attorneys had violated rule 2-100. "[T]he evidence confirms that none of the employees interviewed by ELF were asked about their own actions. Rather, they were asked about their observations as percipient witnesses. This is precisely the type of questioning that is permitted under Rule 2-100." They argued "the False Claims Act . . . clearly contemplates that a defendant's employees may provide information to Plaintiffs' counsel during the course of counsel's investigation." Plaintiffs also challenged the credibility of Lal's declarations in light of four contrary plaintiff-side declarations and evidence that Lal apparently feared employer retaliation, thus giving him a motive to inaccurately describe the meeting. Plaintiffs' counsel further argued injunctive relief was unnecessary because

---

[4] "While representing a client, a member shall not communicate directly or indirectly about the subject of the representation with a party the member knows to be represented by another lawyer in the matter, unless the member has the consent of the other lawyer." (Rule 2-100(A).) A "party" is defined to include "(1) An officer, director, or managing agent of a corporation or association, and a partner or managing agent of a partnership; or [¶] (2) An association member or an employee of an association, corporation, or partnership, if the subject of the communication is any act or omission of such person in connection with the matter which may be binding upon or imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization." (Rule 2-100(B).)

they had averred, and were willing to state again in writing, that they did not intend to interview any more FSI employees.

At the August 2, 2011 hearing, the court (Hon. Loretta M. Giorgi) made no specific credibility findings, but said, "While I understand it's important for plaintiffs to try to put together their case, . . . declarations I have been reading have raised real issues of concern of whether or not it has crossed a line. I don't think it has quite yet crossed it, but it has certainly gotten there in terms of communication with a represented party. [¶] . . . [M]y inclination . . . is to grant this in part and to . . . come up with some type of protocol that you guys need to follow in order to interview witnesses in the future that happen to be employees of the corporation." The court added, "both sides are behaving badly, quite honestly. . . . [¶] I'm not going to issue the preliminary injunction, but I'm going to hold [plaintiffs to their] representation to this court [that they would not contact any more FSI employees]. [¶] . . . [¶] . . . You've got to be careful when you're talking to their employees. . . . [I]n part, for the employee's sake. [¶] Everyone has now put this poor gentleman in a very difficult position. And whether or not he was actually lied to, we don't know, but he feels he has been put in a difficult position. . . . [¶] . . . [¶] . . . And I am also concerned that he feels pressured that he is going to lose his job if he doesn't file or sign declarations to that effect. So everyone needs to lay off this man at this point."

FSI's counsel expressed concern that Contreras or Padilla, whom he characterized as "instruments of counsel," telephoned Lal after the temporary restraining order was issued. The court said, "I don't want [the individual plaintiffs] contacting other employees and getting them involved at this point. . . . [T]his needs to be conducted between the lawyers. Discovery needs to be conducted per the rules of discovery." Plaintiffs' counsel noted that Contreras and Padilla knew many FSI employees and frequently encountered them, and the court clarified that they were free to talk to those employees about any subject other than the lawsuit. "And if the people they talk to bring it up . . . [¶] . . . [¶] . . . they should just say talk to the lawyers. [¶] . . . [¶] . . . [T]hey can't be out soliciting folks to give information or anything of that sort. They shouldn't have any discussion. That taints your witness."

An August 2, 2011 minute order stated, "Argued and the court rules as follows: motion for preliminary injunction is denied without prejudice. Attorneys are to conduct discovery pursuant to the discovery rules. *Parties are to be instructed not to talk about the lawsuit with employees.*"[5] (Italics added.)

---

[5] On August 3, 2011, the court (Judge Giorgi) ruled that ELF did not have to disclose which FSI employees it had interviewed.

On September 15, 2011, the court (Hon. Ernest H. Goldsmith) denied ELF's motion to quash a notice of deposition for Wheaton, an ELF officer and a lawyer for plaintiffs, on issues

B. *Second Application for Preliminary Injunction*

On December 27, 2011, FSI filed a second motion for a preliminary injunction. The following evidence was presented in relation to the motion.

On October 4, 2011, plaintiffs' attorney Thomas Sims informed FSI's counsel that he wanted to depose David Herro, an FSI employee who was out on workers' compensation leave. FSI counsel Jesse L. Miller responded that Herro had refused to talk to FSI when FSI contacted him about the case and had referred FSI to his workers' compensation lawyer, Ralph Mann. Miller had tried to contact Mann but was unsuccessful. On October 24, Miller's office gave Sims contact information for Mann so he could try to contact Mann himself.

On November 11, 2011, Sims finally made contact with Mann and, at Mann's request, arranged to depose Herro in Mann's office so Mann would be available if any workers' compensation issues came up during the deposition. Sims informed FSI's counsel of this development. On November 29, Mann's office informed Sims that they were available for the deposition on December 16. At Sims's request, they agreed to check whether Herro was available on that date. Sims informed FSI's counsel of the deposition date.

On December 1, 2011, Mann's office informed Sims that Herro wanted to speak with him. Mann's office e-mailed Sims the phone number for Herro and asked Sims to confirm with Herro that he was available on December 16, the tentative deposition date. Sims replied by e-mail: "As I explained to Mr. Mann previously, I am the attorney for three plaintiffs. who are suing Mr. Herro's employer, [FSI], and we have asked to take Mr. Herro's deposition. I understand from our conversation yesterday that Mr. Herro would like me to call him regarding his deposition. If that's not correct, please let me know." Mann's assistant replied by e-mail: "You are correct[.] Mr. Herro does want you to call hi[m] directly to set his deposition. . . . Please let me know once you have confirmed the depo date [which had changed to December 19 at the request of FSI's counsel] so I [can] add it to Ralph Mann's calendar." Printouts of these e-mails are in the record.

Sims averred that he called Herro on December 6, 2011. The record contains a screenshot from Sims's smartphone that appears to corroborate the date and time of the call. Sims averred that he spoke to Herro only on that occasion. "In that conversation I confirmed that Mr. Herro was available on December 19, 2011 for a deposition and explained that he would be served

that included the Lal meeting. Plaintiffs petitioned for writ review of the order and we asked for a response from FSI. After briefing was complete, plaintiffs' request to dismiss the petition was granted. (*San Francisco Unified School Dist. v. Superior Court* (Feb. 3, 2012, A134032).)

with a subpoena. Mr. Herro began asking me questions about the topics that would be covered at his deposition. Rather than answering Mr. Herro's questions, I suggested that we schedule a call with Mr. Herro's workers' compensation counsel. [¶] . . . On December 7, 2011, I followed up with Mr. Mann's office about scheduling a call with Mr. Herro. However, the next day I contacted Mr. Mann's office and suggested instead that, if Mr. Herro preferred, I could send Mr. Herro a copy of the transcript of a deposition I took of one of his co-workers so that Mr. Herro could understand the topics that [would] likely be covered during his deposition. Mr. Mann's office contacted Mr. Herro and then notified me that Mr. Herro would like me to send a copy of the deposition transcript. I therefore overnighted a copy of the deposition transcript of Alex Ageev (including exhibits), who is a current [FSI] mechanic that I deposed recently. I have not sent any other documents to Mr. Herro, nor have any other counsel for Plaintiffs done so."[6]

Herro averred that he received a phone call from Sims "on or about" November 29, 2011,[7] and that Sims identified himself as plaintiffs' counsel in this lawsuit and said he wanted to discuss the case with Sims over the phone or in person. The declaration is dated December 14, 2011. On that date, Miller prepared Herro for his deposition in this case.

On December 15, 2011, Miller asked Sims if he had contacted Herro. Sims acknowledged the call and reported that he had also sent Herro a binder of documents. He argued the contact was permissible because Mann had given him permission to speak to Herro and because they discussed only the logistics of Herro's deposition and not the substance of the case. Miller disagreed and informed Sims he intended to present the matter to the court on an expedited basis. Miller said, "I want to reiterate that I represent Herro."

On December 19, 2011, Miller called Sims and asked if Contreras had called Herro to discuss the lawsuit. Sims acknowledged that Contreras had called Herro on December 15, but claimed that Judge Giorgi's order did not prohibit Contreras from contacting current employees.

In its motion for injunctive relief, FSI argued that Sims and Contreras had violated Judge Giorgi's admonishment not to contact current FSI employees. FSI further argued that Mann could not grant Sims leave to speak to Herro about this lawsuit because "[i]t is not the workers compensation attorney's position to waive [*FSI's*] *right* to keep its employees free from *ex parte*

---

[6] At the January 4, 2012 hearing, Sims explained that he took the initiative on this matter because he had been informed that Herro did not want to speak to FSI's counsel and he knew Mann would not be able to answer Herro's questions about the scope of the deposition.

[7] Herro's declaration was typed with a blank for the date of the phone call with Sims and the November 29 date was handwritten in the blank and initialed by Herro.

communications from opposing counsel in an entirely separate action." FSI argued Sims's characterization of the call as logistical was inaccurate: "According to Mr. Herro, Mr. Sims wanted to talk about the case, not just set up a deposition. Moreover, sending Mr. Herro hundreds of pages of cherry-picked records to review before his deposition is not 'logistical.' Sending Mr. Herro documents to review was obviously designed to influence his testimony, which is precisely what Judge Giorgi's Minute Order and instructions from the bench were designed to prevent."[8] FSI did not argue that the contacts violated rule 2-100. It asked the court to sanction plaintiffs' counsel for misusing the discovery process and violating court orders.

Plaintiffs argued there had been no violation of Judge Giorgi's orders. They represented in their briefs that Contreras had merely left a message for Herro and that he had done so for a purpose unrelated to the lawsuit. Nevertheless, they argued that the individual plaintiffs could contact current FSI employees without violating rule 2-100 as long as they did so on their own initiative and not under the direction of counsel. They also asserted that an order preventing plaintiffs' counsel from talking to a current FSI employee like Herro who "requested to speak with me of his own accord, with no prompting from the plaintiffs, . . . or from plaintiffs' counsel, . . . would be a violation both of [the employee's] rights and of the Government Code section . . . wherein an employee . . . should be entitled to voluntarily provide information in furtherance of a False Claims case." They argued that Judge Giorgi's order, which directed Contreras and Padilla to refer any employees who wanted to talk about the lawsuit to plaintiffs' counsel, had implied that counsel was free to talk to such employees at the employees' own request.

The court (Hon. Ernest H. Goldsmith) expressed particular concern about Contreras's phone call to Herro. "[T]herein lies the biggest problem. . . . They aren't lawyers. How are they going to know the subtleties, what they can do and not do? [¶] . . . [T]hey're in a lawsuit and it's uppermost in their minds, it's the biggest thing in their life, . . . I think that that is what ought to be foreclosed . . . [¶] . . . [¶] . . . because that's solicitation." The court ordered the individual plaintiffs not to discuss the lawsuit with current employees and to refer any employees who wanted to discuss the case to plaintiffs' counsel.

The court acknowledged a countervailing concern that FSI employees' statutory right to provide information on False Claims Act matters be

---

[8] At the January 4, 2012 hearing, FSI further disputed Sims's assertion that Herro initially approached him. FSI's counsel represented to the court that it could present a declaration by Herro that Sims initiated the contact and Herro never asked to speak to Sims and did not want plaintiffs or plaintiffs' counsel to contact him in the future.

preserved.[9] The court and the parties ultimately agreed on a protocol plaintiffs' counsel would follow if they were approached by a current FSI employee on the employee's own initiative: plaintiffs' counsel would immediately notify FSI's counsel of the contact but could continue the communication following the notification in the absence of and without the need for further consent by FSI's counsel. The court denied FSI's request for sanctions, with some ambiguity in its expressed reasons: "I believe there were orders . . . by Judge Giorgi. I believe that there was sufficient evidence to warrant an injunction; however, I think that sanctions would require a set of findings that would best not be made, so I'm going to deny it."

The court's written order, filed on January 6, 2012, states:

"1. Plaintiffs' counsel, and all agents and affiliates of Plaintiffs' counsel, are to refrain from all manner of *ex parte* communications with current [FSI] employees during the pendency of this lawsuit. If Plaintiffs' counsel, or their agents or affiliates, want to speak with current [FSI] employees, they must do so through depositions. However, in the event a current [FSI] employee voluntarily initiates contact with Plaintiffs' counsel, then Plaintiffs' counsel may communicate with the employee on an *ex parte* basis. In this situation, before discussing any substantive matters with the employee, Plaintiffs' counsel must first notify [FSI's] counsel that the *ex parte* contact occurred.

"2. Plaintiffs Manuel Contreras and William Padilla are to refrain from discussing this case, or any subjects related to this case, with current [FSI] employees during the pendency of this lawsuit. Neither Mr. Contreras nor Mr. Padilla may contact [FSI] employees and solicit [FSI] employees to contact Plaintiffs' counsel. If a [FSI] employee voluntarily initiates contact with Mr. Contreras or Mr. Padilla and begins to discuss this case, or any subjects related to this case, then Mr. Contreras or Mr. Padilla are to tell the employee that they cannot discuss this case but that the employee can contact Plaintiffs' counsel, and then Mr. Contreras and Mr. Padilla shall have no further discussions regarding the case with the employee.

"3. [ELF] (including all members, officers, directors, principals and employees of [ELF]) shall not communicate with current [FSI] employees. If a [FSI] employee voluntarily initiates contact with ELF, then ELF is to tell the employee that they may contact Plaintiffs' outside counsel, and then ELF shall have no further contact with the employee."

---

[9] As we discuss further *post*, then operative section 12653, subdivision (a) provided that "No employer shall make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency or from acting in furtherance of a false claims action, including investigating, initiating, testifying, or assisting in an action filed or to be filed under Section 12652."

Plaintiffs appeal from this order.

## II. Discussion

Plaintiffs challenge only paragraph 2 of the January 2012 order, which bars the individual plaintiffs from discussing the lawsuit with current FSI employees. They argue the order is unsupported by any evidence that either plaintiffs or plaintiffs' counsel violated rule 2-100, that it violates the policies underlying the False Claims Act, and that it infringes the free speech rights of the individual plaintiffs.

### A. *Standard for Injunctions*

In the trial court and on appeal, the parties have characterized FSI's injunctive relief request as an application for a "preliminary injunction." However, preliminary injunctions are issued to preserve the status quo pending a trial on the merits of the action. (*Paradise Hills Associates v. Procel* (1991) 235 Cal.App.3d 1528, 1537 [1 Cal.Rptr.2d 514], disapproved on other grounds in *Kowis v. Howard* (1992) 3 Cal.4th 888, 898 [12 Cal.Rptr.2d 728, 838 P.2d 250].) A court issues the injunction when it determines that the plaintiff is likely to prevail on the merits and the interim harm to the plaintiff if the injunction is denied outweighs the interim harm to the defendant if the injunction is issued. (*Paradise Hills Associates v. Procel*, at pp. 1537–1538.) Here, the injunctions were sought by the defendant, not the plaintiffs, and the requested injunctions were designed not to preserve the status quo with respect to the parties' underlying dispute (i.e., the maintenance and repair of FSI's buses and FSI's representations to SFUSD), but rather to prohibit allegedly improper behavior with respect to the litigation process itself. Moreover, the January 2012 order contains no language suggesting it was preliminary to an anticipated later determination of whether there had been a violation of Judge Giorgi's order or whether any permanent injunction should be issued.

We therefore construe the order as an exercise of the court's inherent power to control the proceedings before it. (See Code Civ. Proc., § 128; *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 967 [67 Cal.Rptr.2d 16, 941 P.2d 1203] ["well established that courts have fundamental inherent equity, supervisory, and administrative powers, as well as inherent power to control litigation before them"]; *Continental Ins. Co. v. Superior Court* (1995) 32 Cal.App.4th 94, 107–108 [37 Cal.Rptr.2d 843] (*Continental Insurance*) [discussing court's inherent power to impose evidentiary sanction based on finding of rule 2-100 violation].) Accordingly, our focus is not whether the order was appropriate as an interim remedy (based on a *likelihood* of proving a rule 2-100 violation or other ground for the injunction and a balancing of

*interim* harms), but whether the order was a proper exercise of the court's inherent authority based on the evidence before it.[10]

We review orders issued pursuant to the court's inherent powers for abuse of discretion. (*Continental Insurance, supra,* 32 Cal.App.4th at p. 108.) "The trial court's factual findings underpinning [the] order are binding on this court unless unsupported by substantial evidence. [Citation.] However, the trial court's conclusions of law are not binding on us and are reviewed de novo. [Citation.] The scope of discretion always resides in the particular law being applied; action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an abuse of discretion. [Citation.]" (*Ibid.*)

In cases that raise plausible First Amendment concerns, a reviewing court should make an independent examination of the supporting record to ensure that the speakers' free speech rights have not been infringed by the trier of fact's determination that the communication at issue was unlawful. (*In re George T.* (2004) 33 Cal.4th 620, 631–632 [16 Cal.Rptr.3d 61, 93 P.3d 1007]; *McCoy v. Hearst Corp.* (1986) 42 Cal.3d 835, 842 [231 Cal.Rptr. 518, 727 P.2d 711].)

B. *Propriety of Injunction*

FSI urged the court to impose the challenged injunction based on an alleged violation of Judge Giorgi's August 2, 2011 orders. Although Judge

---

[10] In *Triple A Machine Shop, Inc. v. State of California* (1989) 213 Cal.App.3d 131, 138 [261 Cal.Rptr. 493] (*Triple A*), this court reviewed an injunction very similar to the one under review here under the standard of review for a preliminary injunction. However, our analysis focused exclusively on whether the defendant had made "a prima facie showing of entitlement to injunctive relief[:] . . . a real threat of immediate and irreparable injury . . . ." (*Ibid.*) We held the defendant failed to make this showing primarily because it had not established a past or planned future violation of rule 2-100. (*Triple A,* at pp. 138–140.) Thus, *Triple A* is consistent with the standard of review we apply in this opinion.

Similarly, a case repeatedly cited by FSI, *Dodge, Warren & Peters Ins. Services, Inc. v. Riley* (2003) 105 Cal.App.4th 1414, 1418–1420 [130 Cal.Rptr.2d 385] (*Dodge*), purports to apply the standard of review for preliminary injunctions and specifically cites Code of Civil Procedure section 526, subdivision (a)(3). Section 526, subdivision (a)(3) of the Code of Civil Procedure provides that a preliminary injunction may be granted "[w]hen it appears, during the litigation, that a party to the action is doing, or threatens, or is about to do, or is procuring or suffering to be done, some act in violation of the rights of another party to the action respecting the subject of the action, and tending to render the judgment ineffectual." *Dodge,* however, also expressly refers to the court's inherent power to control the proceedings before it and states, "We cannot conceive, as a matter of policy, given the broad discretion possessed of the trial court to ensure the effective administration of justice, why injunctive relief should not be available under circumstances such as these, should it otherwise be merited." (*Dodge,* at pp. 1418–1419.) We conclude it is most appropriate to review the order at issue in this case under the court's inherent power to control the proceedings before it rather than its power to issue preliminary injunctions.

Giorgi denied FSI's first request for a preliminary injunction, she said during the hearing on the motion that she would hold plaintiffs' attorneys to their representation that they did not intend to interview current FSI employees in the future, and that she did not want Contreras and Padilla to talk to any current FSI employees about the lawsuit. Although the record does not reflect a formal order by Judge Giorgi from the bench, a minute order states, "Attorneys are to conduct discovery pursuant to the discovery rules. Parties are to be instructed not to talk about the lawsuit with employees."[11]

Judge Goldsmith did not clearly state whether he issued the January 2012 order based on a violation of Judge Giorgi's orders or a violation of rule 2-100. He noted that he had reviewed the papers filed in relation to Judge Giorgi's orders (i.e., the evidence on which those orders were based). Judge Goldsmith also said, "I believe I should give deference to Judge Giorgi's position in this matter," and he questioned whether Contreras's call to Herro was a violation of Judge Giorgi's order that the individual plaintiffs should have only social contacts with FSI employees. "Mr. Contreras called one of these people and left a message. . . . [¶] . . . There's a difference between calling and running into somebody at the Safeway. [¶] And I think there's a strong implication that Mr. Contreras sought to discuss this case with the witness . . . ." The court further implied that this conduct by Contreras violated plaintiffs' counsel's representations to Judge Giorgi that they did not intend to interview any more FSI employees. "[W]hen you say 'We won't do something,' that means them, too, they're plaintiffs." On the other hand, Judge Goldsmith, in denying FSI's request for sanctions, said "I'm not going to rule whether there's a violation or no violation. . . . [¶] The order—there were orders from—I believe there were orders by—Judge Giorgi. I believe there was sufficient evidence to warrant an injunction; however, I think that sanctions would require a set of findings that would best not be made, so I'm going to deny it."

█ In light of the ambiguity of the court's comments, we will consider whether the court's January 2012 order was justified based on evidence of either a violation of Judge Giorgi's prior orders or an independent violation of rule 2-100. The violation of a court order cannot justify issuance of an injunction as a sanction unless the underlying court order was lawful. (See *Conservatorship of Becerra* (2009) 175 Cal.App.4th 1474, 1480–1481 [96 Cal.Rptr.3d 910].) Therefore, in order to determine whether the January 2012 order was justified based on violations of the August 2011 orders, we must determine whether the court's August 2011 orders themselves were valid. FSI defends the August 2011 orders as proper responses to alleged violations of rule 2-100 by Contreras and plaintiffs' counsel, and proper orders to prevent

---

[11] We note that the minute order is directed to the attorneys, and not to the parties.

witness tampering. FSI also argues plaintiffs' and plaintiffs' counsel's conduct following the August 2011 orders independently violated rule 2-100 and constituted witness tampering. In sum, therefore, we consider whether the January 2012 order as it applies to the individual plaintiffs is justified by evidence of rule 2-100 violations or witness tampering either before or after the issuance of Judge Giorgi's August 2011 orders.

It is possible that plaintiffs' counsel's interview of Lal in March 2011 violated rule 2-100. Significantly, however, Judge Giorgi expressly declined to find that such a violation had occurred. Even more significantly, there is no evidence in the record that plaintiffs' counsel in any way directed the individual plaintiffs to contact FSI employees on their behalf in a manner that violated rule 2-100, and contacts with FSI employees by the individual plaintiffs on their own initiative are clearly exempt from the proscriptions of rule 2-100. Because there has been no finding of a rule violation by plaintiffs' counsel and there is no evidence that plaintiffs' counsel indirectly violated the rule by instructing the individual plaintiffs to communicate with FSI employees on counsel's behalf, we conclude paragraph 2 of the January 2012 order is not supported by evidence of rule 2-100 violations. We further conclude the order is not supported by evidence of witness tampering. Accordingly, we vacate the injunction as it applies to the individual plaintiffs.

### 1. *Rule 2-100*

Rule 2-100 provides: "(A) While representing a client, a member shall not communicate directly or indirectly about the subject of the representation with a party the member knows to be represented by another lawyer in the matter, unless the member has the consent of the other lawyer.

"(B) For purposes of this rule, a 'party' includes:

"(1) An officer, director, or managing agent of a corporation or association, and a partner or managing agent of a partnership; or

"(2) An association member or an employee of an association, corporation, or partnership, if the subject of the communication is any act or omission of such person in connection with the matter which may be binding upon or imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization.

"(C) This rule shall not prohibit:

"(1) Communications with a public officer, board, committee, or body; or

"(2) Communications initiated by a party seeking advice or representation from an independent lawyer of the party's choice; or

"(3) Communications otherwise authorized by law."

 "[Rule 2-100] is necessary to the preservation of the attorney-client relationship and the proper functioning of the administration of justice . . . . It shields the opposing party not only from an attorney's approaches which are intentionally improper, but, in addition, from approaches which are well intended but misguided. [¶] The rule was designed to permit an attorney to function adequately in his [or her] proper role and to prevent the opposing attorney from impeding his [or her] performance in such role. If a party's counsel is present when an opposing attorney communicates with a party, counsel can easily correct any element of error in the communication or correct the effect of the communication by calling attention to counteracting elements which may exist." (*Mitton v. State Bar* (1969) 71 Cal.2d 525, 534 [78 Cal.Rptr. 649, 455 P.2d 753] [discussing former rule 12].)

" '[A] bright line test is essential. As a practical matter, an attorney must be able to determine beforehand whether particular conduct is permissible; otherwise, an attorney would be uncertain whether the rules had been violated until . . . he or she is disqualified. Unclear rules risk blunting an advocate's zealous representation of a client.' [Citation.] Further, rule 2-100 must be interpreted narrowly because 'a rule whose violation could result in disqualification and possible disciplinary action should be narrowly construed when it impinges upon a lawyer's duty of zealous representation.' [Citation.]" (*Snider v. Superior Court* (2003) 113 Cal.App.4th 1187, 1197–1198 [7 Cal.Rptr.3d 119] (*Snider*).)

When a trial court finds a violation of rule 2-100, its remedial powers are limited to ameliorating effects of the violation on the proceeding before it. "[T]he propriety of punishment for violation of the Rules of Professional Conduct is a matter within the purview of the State Bar, not of a court presiding over the affected case. (See Bus. & Prof. Code, § 6077; *Noble v. Sears, Roebuck & Co.* (1973) 33 Cal.App.3d 654, 658–659 [109 Cal.Rptr. 269].) Instead, what the court must do is focus on identifying an appropriate remedy for whatever *improper effect* the attorney's misconduct may have had in the case before it." (*Myerchin v. Family Benefits, Inc.* (2008) 162 Cal.App.4th 1526, 1538 [76 Cal.Rptr.3d 816], disapproved on other grounds in *Village Northridge Homeowners Assn. v. State Farm Fire & Casualty Co.* (2010) 50 Cal.4th 913, 929, fn. 6 [114 Cal.Rptr.3d 280, 237 P.3d 598].)

### a. *Lal's and Herro's Status as Parties Under Rule 2-100*

The threshold question in determining whether there was evidence before the trial court of rule 2-100 violations is whether the FSI employees at issue—Lal and Herro[12]—were represented "parties" within the meaning of the rule. We conclude that their status as "parties" was dependent on the precise nature of the communications they had with plaintiffs' counsel.

▉ FSI does not contend that Lal or Herro qualified as a "party" under subdivision (B)(1) of rule 2-100 or the "statement" clause of subdivision (B)(2). Under rule 2-100(B)(1), a corporate employee is a party if he or she is an "officer, director, or managing agent." *Snider* holds that a "managing agent" within the meaning of this rule is an employee who "exercises substantial discretionary authority over organizational policy." (*Snider, supra*, 113 Cal.App.4th at p. 1209.) There is no evidence Lal or Herro had such authority. Under the "statement" clause of rule 2-100(B)(2), a corporate employee is a party if his or her "statement may constitute an admission on the part of the organization." California's law of evidence dictates that this clause covers only "high-ranking organizational agents who have actual authority to speak on behalf of the organization." (*Snider*, at pp. 1203, 1210.) Again, there is no evidence that Lal or Herro had such authority.

▉ The key issue, therefore, is whether Lal or Herro were parties under the acts or omissions clause of subdivision (B)(2) of rule 2-100. This clause proscribes ex parte contacts with an employee of a represented corporation "if the subject of the communication is any act or omission of such person in connection with the matter which may be binding upon or imputed to the organization for purposes of civil or criminal liability." We are not aware of any California decision that construes this language. California courts have construed other terms in rule 2-100 by reference to California tort and evidence law. (See *Snider, supra*, 113 Cal.App.4th at pp. 1207–1210 [construing "managing agents" in rule 2-100(B)(1) and binding "admissions" in rule 2-100(B)(2) according to Cal. tort and evidence law]; see also ABA Com. on Prof. Ethics, formal opn. No. 91-359 (1991) ["[w]hether an employee falls into any of the[] three categories [of the rule] is inevitably an issue affected by a host of factors, . . . [which] include at least the terms of the relevant statutory and common law of the state of the corporation's incorporation"].) It is well established under California tort law that the conduct of an employee acting within the scope of his employment is imputed to the employer under the doctrine of respondeat superior. (*Miller v. Stouffer* (1992)

---

[12] Little information appears in the record about Cappel's communications with FSI employees other than Lal, or the identity of those employees. It is the documented communications with Lal which formed the primary evidentiary foundation for FSI's motion for injunctive relief.

9 Cal.App.4th 70, 77–78, 84 [11 Cal.Rptr.2d 454].) For purposes of this opinion, we shall assume that any act or omission of a corporate defendant's employee within the scope of that employee's employment might be imputed to the corporation within the meaning of the act or omission clause of rule 2-100.

Applying this standard to the evidence, we conclude Lal was potentially a party within the meaning of rule 2-100. Lal worked for FSI as a bus mechanic and the subject matter of the lawsuit was FSI's allegedly inadequate repair and maintenance of its buses. Thus, if the subject matter of a communication with Lal was his acts or omissions while working as an FSI bus mechanic, the communication might well have been prohibited by rule 2-100. Given that Herro stated that he also was a mechanic for Laidlaw/FSI, we shall assume for purposes of argument that he was a potential party for these same reasons.

### b. Contacts by Plaintiffs' Counsel

Rule 2-100 is violated only if an attorney communicates with an employee of the opposing corporate party about acts or omissions of the employee that might be imputed to the corporation. There is conflicting evidence in the record about whether plaintiffs' counsel asked Lal if he had "done anything wrong himself" regarding bus maintenance and repair at Laidlaw/FSI. Plaintiffs insist that their counsel followed a strict protocol precisely to avoid asking questions about Lal's and other FSI employees' personal acts or omissions.[13] Judge Giorgi did not resolve this factual conflict. She commented that the evidence "raised real issues of concern of whether or not it has crossed a line. I don't think it has quite yet crossed it, but it has certainly gotten there in terms of communication with a represented party." As to Herro, there is no evidence in the record that plaintiffs' counsel asked Herro anything about his acts or omissions on the job or otherwise discussed those acts or omissions with Herro. Moreover, Judge Goldsmith made no express finding that plaintiffs' counsel violated rule 2-100 while communicating with Herro and instead focused his attention during the January 2012 hearing on the conduct of the individual plaintiffs.

---

[13] We observe, however, that California courts have held that attorneys should resolve doubts about whether communications violate the rule by avoiding suspect communications and seeking court guidance. (See *Abeles v. State Bar* (1973) 9 Cal.3d 603, 609 & fn. 7 [108 Cal.Rptr. 359, 510 P.2d 719] [doubt regarding whether interviewee had counsel of record; applying former rule 12]; *Mills Land & Water Co. v. Golden West Refining Co.* (1986) 186 Cal.App.3d 116, 130–131 [230 Cal.Rptr. 461] [doubt regarding whether former rule 7-103 applied to dissident corporate director].) The need to seek such guidance particularly arises where the "bright line" rules suggested by *Snider, supra*, 113 Cal.App.4th at pages 1197–1198, are lacking.

Since plaintiffs do not challenge the injunction as to counsel, we need not decide whether the January 2012 injunction's restrictions on plaintiffs' counsel are supported by evidence or a finding of a rule 2-100 violation. For purposes of our review of the injunction's restrictions on the individual plaintiffs' communications with FSI employees, however, we find it significant that there is neither unambiguous evidence nor a judicial finding of a rule violation by plaintiffs' counsel, which might indirectly support the order as it applies to the individual plaintiffs.

### c. Contacts by Individual Plaintiffs

Case law and other legal authority clearly establish that the individual plaintiffs' contacts with FSI employees violated rule 2-100 only if the contacts were wrongfully orchestrated by plaintiffs' counsel. Because there is no evidence of such wrongful involvement by the attorneys, we conclude there is no evidence of rule 2-100 violations carried out by the individual plaintiffs.

■ Rule 2-100 applies only to members of the California Bar, i.e., attorneys. It does not prevent parties from speaking to other parties about the lawsuit in the absence of and without the consent of counsel. (*Snider, supra,* 113 Cal.App.4th at p. 1211.) Indeed, paragraph 2 of the rule 2-100 discussion specifically states, "Rule 2-100 is not intended to prevent the parties themselves from communicating with respect to the subject matter of the representation . . . ."[14] Consequently, if Contreras communicated with Lal or Herro on his own initiative,[15] the communications did not violate rule 2-100.

■ If plaintiffs' counsel used Contreras to indirectly communicate with FSI employees in violation of rule 2-100, the communications violated the rule. Rule 2-100(A) expressly prohibits attorneys from "communicat[ing] . . .

---

[14] Federal courts have found no violation of rules analogous to rule 2-100 where an employer directly negotiated settlements of pending employment discrimination claims with represented employees without their counsel's consent (*Dorsey v. Home Depot U.S.A., Inc.* (D.Md. 2003) 271 F.Supp.2d 726, 728, 730 [applying Md. Rules of Prof. Conduct, rule 4.2]); a city employee communicated directly with represented city residents about the general subject matter of their suit against the city (*Northwest Bypass v. U.S. Army Corps of Engineers* (D.N.H. 2007) 488 F.Supp.2d 22, 26–29 [applying N.H. Rules of Prof. Conduct, rule 4.2]); and, most relevant here, a plaintiff suing his current employer for employment discrimination was free to talk to any other employees of the defendant corporation about the lawsuit (*Holdren v. General Motors Corp.* (D.Kan. 1998) 13 F.Supp.2d 1192, 1195 (*Holdren*) [applying Kan. Rules of Prof. Conduct, rule 4.2]).

[15] We note that FSI focuses on Contreras's communications with FSI employees as examples of alleged rule 2-100 violations by the individual plaintiffs. As to Padilla, the only evidence of communications with FSI employees is his attendance at the Wheaton meeting with Lal and his receipt of a litigation-related photograph from another FSI employee. Our analysis of Contreras's conduct applies equally to this evidence.

indirectly" with represented parties in violation of the rule. FSI alleges that plaintiffs' counsel did just that. However, as discussed *post*, attorneys are afforded considerable latitude in advising their clients regarding communications with opposing parties. We conclude there is no substantial evidence that plaintiffs' counsel violated rule 2-100 by indirectly communicating with FSI employees through the individual plaintiffs.

Paragraph 2 of the rule 2-100 discussion expressly provides that "nothing in the rule prevents a member from advising the client that [direct] communication [with a represented opposing party] can be made." Several courts and bar association ethics committees have concluded further that attorneys may actively advise their clients regarding such communications as long as the attorney does not overreach in light of the purposes underlying the rule.

The State Bar Standing Committee on Professional Responsibility and Conduct, Formal Opinion No. 1993-131 (1993) (Opinion No. 1993-131), states that attorneys "need not discourage clients from direct communication with one another" and "[i]nformation obtained by a client from an opposing party represented by counsel where there has been no prohibited direct or indirect communication under rule 2-100 may properly be communicated by the client to the attorney and used by the attorney as is otherwise appropriate. [¶] . . . [¶] [On the other hand,] [w]hen the content of the communication to be had with the opposing party originates with or is directed by the attorney, [the communication] is prohibited by rule 2-100. Thus, an attorney is prohibited from drafting documents, correspondence, or other written materials, to be delivered to an opposing party represented by counsel even if they are prepared at the request of the client, are conveyed by the client and appear to be from the client rather than the attorney. . . . [¶] An attorney is also prohibited from scripting the questions to be asked or statements to be made in the communications or otherwise using the client as a conduit for conveying to the represented opposing party words or thoughts originating with the attorney." In general, "counsel should be guided by the overriding purpose of rule .2-100, which is to prohibit one side to a dispute from obtaining an unfair advantage over the other side as a result of having ex-parte access to a represented party." (Opn. No. 1993-131.)

Similarly, the American Bar Association (ABA) Committee on Ethics and Professional Responsibility, Formal Ethics Opinion No. 11-461 (2011) (ABA Opinion No. 11-461) states, "Even though parties to a matter are represented by counsel, they have the right to communicate directly with each other. . . . A client may ask the lawyer for advice on whether the client may lawfully communicate directly with a represented person without their lawyer's consent or their lawyer being present. The comments to [ABA Model Rules of Professional Conduct,] Rules 4.2 and 8.4(a) state that

such advice is proper. Even if the client has not asked for the advice, the lawyer may take the initiative and advise the client that it may be desirable at a particular time for the client to communicate directly with the other party." (Fns. omitted.) ABA Opinion No. 11-461 also endorses the general rule that the extent of a lawyer's advice to a client planning to communicate with a represented party should be guided by "whether the lawyer's assistance is an attempt to circumvent the basic purpose of [ABA Model Rules of Professional Conduct,] Rule 4.2, to prevent a client from making uninformed or otherwise irrational decisions as a result of undue pressure from opposing counsel." However, this opinion states a more liberal approach to where this line must be drawn, allowing attorneys to actively counsel their clients about planned communications with represented parties and to draft some documents for use in the communications.[16]

Case law from other jurisdictions supports the view that an attorney crosses the line in advising a client about such communications when the attorney prepares binding legal documents that the client plans to ask the opposing party to sign. (See *Holdren, supra,* 13 F.Supp.2d at pp. 1195–1196 [attorney violated rule when he instructed client how to draft a binding affidavit as distinct from a hearsay witness statement and encouraged client to obtain affidavits from corporate defendant's employees]; *In re Marietta* (1977) 223 Kan. 11 [569 P.2d 921] [attorney violated rule when he drafted release of liability for back child support knowing client intended to ask represented ex-wife to sign the release]; *In re Pyle* (2004) 278 Kan. 230 [91 P.3d 1222, 1228–1229] [attorney violated rule when he drafted affidavit that, inter alia, indirectly admitted liability knowing client intended to ask opposing party to sign it].) These decisions are consistent with the general principle that attorneys should not advise their clients regarding party communications in a

---

[16] "Some authority states that . . . a lawyer may not 'script' or 'mastermind' a client's communication with a represented person and may violate [ABA Model Rules of Professional Conduct,] Rule 4.2 by preparing legal documents for the client to have a represented person sign without the assistance of their counsel. . . . [S]uch a standard, if too stringently applied, would unduly inhibit permissible and proper advice to the client regarding the content of the communication, greatly restricting the assistance the lawyer may appropriately give to a client. . . . [¶] . . . [¶] The lawyer also may draft a document for the client to deliver to the represented adversary although authority restricts the lawyer's assistance to situations where the client originates the communication, stating that it is improper for the lawyer to originate or direct the proposed communication. . . . Such an approach favors only those clients who have the sophistication to ask the lawyer to draft a document . . . . [¶] This Committee favors the approach taken by Restatement [(Third) of the Law Governing Lawyers (2000) section] 99 Comment (k) . Under that approach, . . . the lawyer may review, redraft and approve a letter or a set of talking points that the client has drafted and wishes to use in her communications with her represented adversary. Such advice enables the client to communicate her points more articulately and accurately or to prevent the client from disadvantaging herself. The client also could request that the lawyer draft the basic terms of a proposed settlement agreement that she wishes to have with her adverse spouse, or to draft a formal agreement ready for execution." (ABA Opn. No. 11-461.)

manner that violates the underlying purpose of the rule: preparing legally binding documents for an opposing party to sign takes advantage of the fact that the party is being contacted without knowledge, consent or presence of her legal representative.

Here, there is no evidence that plaintiffs' attorneys overreached. There was no evidence that plaintiffs were acting at the behest of counsel, or that plaintiffs' counsel coached the individual plaintiffs in any way regarding communications with FSI employees, except to inform them they had the right to engage in such communications. Indeed, the record does not disclose that plaintiffs' attorneys were even aware that Contreras planned to contact Lal or Herro before the contacts occurred. Although the timing of Contreras's call to Herro (shortly after FSI's counsel had confronted Sims about his contacts with Herro and shortly before Herro's scheduled deposition) may be suspect, we do not believe this record can support an inference that plaintiffs' counsel was improperly involved in directing that call, and the trial court made no such finding.

In sum, the individual plaintiffs' communications with FSI employees did not violate rule 2-100 if the communications were not improperly directed by plaintiffs' counsel, and there is no substantial evidence that the communications were improperly directed by counsel. Indeed, there is no finding that plaintiffs' counsel violated rule 2-100 in any manner, including by their direct communications with FSI employees. On this record, we conclude rule 2-100 provides no basis for paragraph 2 of the January 2012 order.

### d. *Additional Factors Supporting Reversal of the Order*

██ We believe that reversal is also required by the policies reflected in the False Claim Act's prohibition against employer interference with employee communications in support of a False Claims Act action and that free speech principles raise serious concerns about the order's constitutionality.

Paragraph 1 of the rule 2-100 discussion states, "Rule 2-100 is intended to control communications between a member and persons the member knows to be represented by counsel *unless a statutory scheme or case law will override the rule*. There are a number of express statutory schemes which authorize communications between a member and person who would otherwise be subject to this rule. These statutes protect a variety of other rights

such as the right of employees to organize and to engage in collective bargaining, employee health and safety, or equal employment opportunity." (Italics added.) At the time the January 2012 order was issued, the False Claims Act provided, "No employer shall make, adopt, or enforce any rule, regulation, or policy preventing an employee . . . from acting in furtherance of a false claims action, including investigating, initiating, testifying, or assisting in an action filed or to be filed under Section 12652." (Former § 12653, subd. (a), repealed by Stats. 2012, ch. 647, § 4.) The current statute provides for specific remedies for any employee who is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of his or her employment because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop one or more violations of this article." (§ 12653, subd. (a), added by Stats. 2012, ch. 647, § 5.) FSI could not directly interfere with its employees' ability to speak to, or otherwise cooperate with, plaintiffs' counsel, and we do not see how it could indirectly do so by advising its attorney to withhold consent for interviews with willing employees. The court and the parties appeared to acknowledge this issue, and the January 2012 order was drafted to require prior *notification* of FSI counsel when FSI employees initiated contact with plaintiffs' counsel but not to require FSI counsel's *consent* to or *presence* at meetings between those employees and plaintiffs' counsel.

Paragraph 2 of the January 2012 order also implicates the individual plaintiffs' First Amendment rights.[17] "Orders which restrict or preclude a citizen from speaking in advance are known as 'prior restraints,' and are disfavored and presumptively invalid. Gag orders on trial participants [for example] are unconstitutional unless (1) the speech sought to be restrained poses a clear and present danger or serious and imminent threat to a protected competing interest; (2) the order is narrowly tailored to protect that interest; and (3) no less restrictive alternatives are available." (*Hurvitz v. Hoefflin* (2000) 84 Cal.App.4th 1232, 1241 [101 Cal.Rptr.2d 558], fns. omitted.) These principles have been applied to orders that restrict parties' communications with other parties or witnesses. In *Maggi v. Superior Court*, the court held that orders restricting those plaintiffs' counsel's contacts with witnesses (and potential clients) was an unconstitutional prior restraint unjustified by a

---

[17] FSI argues plaintiffs forfeited their First Amendment argument because they did not raise it in the trial court. We need not resolve this issue because we hold the order must be reversed even disregarding First Amendment concerns because it is unsupported by rule 2-100 and it conflicts with the policies underlying the False Claims Act. In any event, we may exercise our discretion to decide a pure question of law raised for the first time on appeal. (*Ward v. Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534].)

discovery violation. (*Maggi v. Superior Court* (2004) 119 Cal.App.4th 1218, 1223–1226 [15 Cal.Rptr.3d 161].) "Absent a 'protected competing interest' on a level equivalent to the constitutional guarantee of free speech, orders limiting speech are not appropriate sanctions." (*Id.* at p. 1226.) In *Bernard v. Gulf Oil Co.*, the United States Court of Appeal for the Fifth Circuit held that an order restricting communications by named plaintiffs and their counsel with potential class members was an unconstitutional prior restraint. (*Bernard v. Gulf Oil Co.* (1980) 619 F.2d 459, 463, 477.) The Supreme Court affirmed on nonconstitutional grounds, while acknowledging the constitutional concern. (*Gulf Oil Co. v. Bernard* (1981) 452 U.S. 89, 103–104 [68 L.Ed.2d 693, 101 S.Ct. 2193] ["[a]lthough we do not decide what standards are mandated by the First Amendment in this kind of case, we do observe that the order involved serious restraints on expression"]; see *Parris v. Superior Court* (2003) 109 Cal.App.4th 285, 290 [135 Cal.Rptr.2d 90] [precertification communication with potential class members is constitutionally protected speech].) These free speech concerns support the conclusion that rule 2-100 must not be construed in a manner that will unduly interfere with the right of parties to communicate with one another absent compelling evidence of abuse, which we do not find present here.

## 2. Witness Tampering

As noted in our statement of facts, the trial court expressed concern that the individual plaintiffs or plaintiffs' counsel might be intentionally tampering with witnesses by contacting FSI employees or, alternatively, that their unsolicited contacts with the employees—which were inevitably followed by concerned inquiries on the part of FSI counsel—were placing these potential witnesses in difficult and uncomfortable circumstances. FSI raises these concerns in defense of the order, but cites no legal authority that would support the order on this rationale. Nor did the trial court cite any such legal authority.

 There was no evidence presented suggesting that the individual plaintiffs attempted to coerce or intimidate potential witnesses, or that they attempted to improperly influence any FSI employee to testify in a particular manner.[18] Absent such evidence, we doubt that an employee's disquiet or discomfort, particularly in the context of a False Claims Act lawsuit, could justify such an order. Notwithstanding statutory protections against employer

---

[18] We emphasize that we do not question the trial court's authority to take action to prevent demonstrated or threatened abuse of the litigation process and to preserve the integrity of the judicial system. (*Continental Insurance, supra,* 32 Cal.App.4th at pp. 107–108.)

retaliation, it is entirely understandable that a current employee might experience trepidation at even the perception that he or she was acting contrary to the employer's interests. The trial court was correct that the evidence before it showed that Lal was placed "in a very difficult position," and it is hardly surprising that Lal would "express[] his frustration that [Contreras] had placed him in 'the middle of this shit.' " But the policies inherent in the False Claims Act would be seriously undermined if the individual plaintiffs could not approach employees who might have knowledge of fraudulent conduct by the employer. ■ Similarly, free speech rights cannot be defeated simply because a speaker's intended speech may make others uncomfortable.

### C. *Motion to Dismiss*

In July 2012, FSI asked us to dismiss this appeal based on plaintiffs' alleged violation of the January 2012 order. FSI invokes the disentitlement doctrine, which permits dismissal of an appeal when the appellant is in willful disobedience of the trial court order appealed from. (*Guardianship of Melissa W.* (2002) 96 Cal.App.4th 1293, 1299 [118 Cal.Rptr.2d 42].) They allege that Contreras indirectly contacted FSI employees through another FSI employee and urged them to contact plaintiffs' counsel. They produce evidence that a current FSI employee known to be close to Contreras asked Herro (who apparently had returned to work from his workers' compensation leave) and Herro's girlfriend (also an FSI employee) to contact Contreras.

"Appellate disentitlement . . . is not a jurisdictional doctrine, but a discretionary tool that may be applied when the balance of the equitable concerns make it a proper sanction . . . ." (*People v. Puluc-Sique* (2010) 182 Cal.App.4th 894, 897 [106 Cal.Rptr.3d 365].) "In dependency cases, [for example,] the doctrine has been applied only in cases of the most egregious conduct by the appellant . . . ." (*In re E.M.* (2012) 204 Cal.App.4th 467, 474 [138 Cal.Rptr.3d 846]; see *People v. Puluc-Sique*, at pp. 897–898 [refusing to apply disentitlement doctrine to criminal defendant who was "fugitive" from justice only because he was deported by U.S. immigration authorities].) In light of our serious concern that paragraph 2 of the January 2012 order conflicts with the policies articulated in the False Claims Act and constituted an unconstitutional restraint on the free speech rights the individual plaintiffs, we decline to apply the doctrine on the present record and deny FSI's motion to dismiss.

### III. Disposition

Paragraph 2 of the trial court order filed January 6, 2012, is vacated. FSI shall pay the individual plaintiffs' costs on appeal.

Jones, P. J., and Simons, J., concurred.