Filed 10/29/13  P. v. Scott CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B243460 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA079679) |
| v. | |
| THOMAS SCOTT, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Janice E. Croft, Judge.  Affirmed in part, reversed in part.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Marc A. Kohm and Kathy S. Pomerantz, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Thomas Scott appeals his conviction of grand theft, receipt of stolen property and multiple counts of burglary. Appellant contends the trial court erred in disqualifying his retained counsel after she violated the Rules of Professional Conduct by talking to a former codefendant about the case outside the presence of codefendant's counsel. He further contends the court erred in denying his motion to sever three of the burglary counts from the other charges. Finally, he contends the conviction for receipt of stolen property must be reversed, as he was also convicted of theft of the same property. Respondent concedes the final point. We reverse the receipt of stolen property conviction and otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Information*

On February 4, 2011, an information was filed charging appellant with second degree commercial burglary (Pen. Code, § 459) in count one, grand theft of personal property (Pen. Code, § 487, subd. (a)) in count two, receiving stolen property (§ 496) in count three, and first degree burglary (Pen. Code, § 459) in counts four through six.[1] It was further alleged that appellant had suffered nine theft and burglary-related prior offenses between 1990 and 2008, that prison terms were served for said offenses, and that appellant did not remain free of custody for, and committed offenses resulting in felony convictions during, a period of five years subsequent to the conclusion of said terms for purposes of section 667.5, subdivision (b).

---

[1] Undesignated statutory references are to the Penal Code. Teneka Marie Marshall was charged with the same offenses in counts four through six and appeared at all pretrial hearings, but was ultimately not tried with appellant.

B. *Evidence at Trial*

On April 1, 2010, Craig Wiggins, a sergeant for the Los Angeles County Sheriff's Department, and his partner stopped a car near 62nd Street and Central Avenue in Los Angeles. Appellant was a passenger in the vehicle. Sgt. Wiggins and his partner searched appellant and found nine gold coins encased in plastic in one of his pockets. Appellant said the coins were his and that he got them from "some guy."[2]

Martin Chang owned a health food store in San Gabriel. The rear door, which allowed access to his office, was left unlocked when deliveries were expected. Chang owned nine gold coins that he had purchased from Sotheby's in 1996 for $30,000. They were packaged in individual plastic casings or envelopes identifying the seller. On March 28 or 29, 2010, Chang put the coins in a backpack and took it to his office, intending to take the coins to a bank. On April 2 or 3, 2010, deputies came to his business to ask him about the coins. Chang searched his backpack and realized they were missing. Chang identified the gold coins taken from appellant on April 1 as his.

A San Gabriel Police Department investigator found appellant's palm print on a magazine lying on a cabinet in Chang's office near where Chang had placed his backpack.

The deputies who searched appellant on April 1 also found a set of keys inside the vehicle. The keys fit a residence located near where the vehicle was stopped. Inside the residence, deputies found a utility bill with appellant's name on it. They also found a red briefcase containing papers with the name "Sok" and the telephone number of Sarath Sok. Sarath Sok testified that in December 2009, the briefcase was stolen from his place of business in Northridge.

---

[2]     Interviewed after his arrest, appellant said he was a coin collector and had owned the coins for more than a year.

Kristy Jennings lived in a loft apartment located inside the Biscuit Company Loft Building in downtown Los Angeles. There is a restaurant on the ground floor of the building. On March 31, 2010, at 9:00 a.m., a day prior to appellant's arrest, Jennings was home with her infant child. The door to her apartment was unlocked. She saw the door handle turn and the door open. An African-American man put his head in the room. Jennings screamed and the intruder left.

That same day, Michael Cioffoletti, who lived in the same lofts on the same floor, heard some people talking as they came up the stairwell. He observed his unlocked front door opening but because he was sitting behind the door, did not see who opened it. Cioffoletti said "good morning," and the intruders left.

Joshua Newman lived in the same building as Jennings and Cioffoletti, on the same floor. At approximately 9:00 a.m. on March 31, 2010, his unlocked door was opened and two people stepped into his residence. Newman asked if he could help them. The intruders turned and walked out. A few days later, Newman was shown a photographic six-pack and identified appellant as one of the intruders. Newman also identified appellant in a live lineup, at the preliminary hearing, and in court.

The prosecution played a video from a security camera, showing appellant and a female companion entering the building behind two workmen. Appellant was wearing a black t-shirt and khaki pants

The prosecution also played a CD of three telephone calls appellant had made from jail, two on April 3, 2010 and one on April 4. In the first, appellant told a female caller to tell someone to get his beige khakis and black t-shirt out of his dirty laundry. In the second, a female caller said she could not find what appellant asked for and he told her to take all his black t-shirts and khakis, even the clean ones. During the same call, appellant said "[a]ll I did is crack the door" and that someone screamed. Appellant further stated that from outside the apartments

4

looked like businesses.  He also said he did not think anybody could "identify" because it was "so quick" and "nobody never come outside to say nothing" and that "when that lady screamed, we got the fuck out here, then we start jogging, getting out of there."  The caller said "I heard that each coin is worth about one hundred thousand."  Appellant said "Yah."

In the April 4 call, appellant asked the female caller:  "[O]k look, let say this, it's you know [unintelligible] walk in somebody's house [unintelligible] we live at huh. . . .  [¶] How's that burglary?"  He also said:  "I didn't even go in, I just cracked the door" and "I didn't step foot in neither place, . . . not one red foot . . . ."  He pointed out that the doors were unlocked and that "[t]here wasn't no forced entry," which meant "[i]f it[']s any goddamn thing it[']s trespassing right?"  The female caller suggested he might have been "looking for somebody."  Appellant responded:  "Yeah.  Somebody gave me the wrong directions."  He further stated:  "To have a burglary you have to have a forced entry.  It can't be open, how's it a burglary?"


C. *Verdict and Sentencing*

The jury found appellant guilty on all six counts.  Asked to identify the specific property that supported count three, the jury found appellant guilty of receiving Chang's coins but not guilty of receiving Sok's briefcase.  Appellant admitted to seven separate and independent prison priors.

The court imposed a four-year sentence on count four (burglary of Newman's loft), a one-year-four-month sentence on count five (burglary of Jenning's loft), a four-year sentence on count six (burglary of Cioffoletti's loft), an eight-month sentence on count two (grand theft), and an additional five years for

5

the prior prison terms, for a total sentence of 11 years.[3]  The court stayed the sentences on counts one and three under section 654.  Appellant was credited with 999 days of presentence custody credit -- 869 actual days plus 130 days good time/work time.

# DISCUSSION

A. *Disqualification of Appellant's Retained Counsel*

    1. *Background*

Prior to trial, appellant retained Patricia O'Brien to represent him.  His then codefendant, Taneka Marshall, was represented by alternate public defender Beverly Bourne.[4]  At a hearing on October 27, 2011, Bourne asked to speak to the court in chambers.  She reported that she had previously seen O'Brien conversing with Marshall in the hallway outside the courtroom with a notepad and pen in hand.[5]  Bourne had immediately confronted O'Brien and accused her of violating the Rules of Professional Conduct by conversing with a represented client outside the attorney's presence.[6]  In court, O'Brien admitted having a "brief conversation" with Marshall but claimed not to recall exactly what was said.  She later stated she was trying to find out where Marshall and appellant had been on March 31 prior to their alleged entry into the loft building.  The court found O'Brien's claim not to

---

[3]    The court also imposed various fines.

[4]    Until the eve of trial, it appeared that Marshall and appellant would be tried together, albeit with separate juries due to the prosecutor's intention to introduce inculpatory statements made by Marshall which implicated appellant.  (See *Bruton v. United States* (1968) 391 U.S. 123; *People v. Aranda* (1965) 63 Cal.2d 518.)

[5]    Marshall later told Bourne that she was being interviewed by O'Brien and that the conversation took several minutes.

[6]    Bourne reported that when confronted, O'Brien said:  "[W]ell if I asked you for permission, you wouldn't have given it to me, would you?"  O'Brien acknowledged that Bourne had been "very clear that I was not to have any contact with her client."

recall the contents of the conversation "disingenuous," and described the conduct as an "egregious" violation of the Rules of Professional Conduct and "a gross overstepping of [counsel's] role." The prosecutor contended that O'Brien had made herself a potential witness, as anything Marshall said to her would not be protected by the attorney-client privilege. O'Brien offered to review her notes and reveal to the court what had been said. However, Bourne stated she would prefer that information not be revealed to anyone else, and the court agreed it should not be disclosed because of the constitutional rights that could be affected. The court scheduled a hearing on removing O'Brien from the case, and instructed counsel to research the issue.

At the next hearing, O'Brien said she had been attempting to speak to Marshall's family members about where the defendants had been prior to arriving at the lofts when Marshall came forward and volunteered information about several places they had stopped. O'Brien contended the information she received was "helpful as to both clients" and "not interfer[ing] with any kind of attorney-client confidential relationship." The court noted that O'Brien's statements were at odds with what she had said at the prior hearing, and found a potential conflict based on O'Brien's having information that could affect the way the case was tried and the way questions were asked. The court appointed separate counsel to advise appellant of the potential conflict and his options. After conferring with counsel, appellant stated he wanted to continue to be represented by O'Brien. On behalf of Marshall, Bourne asked the court to disqualify O'Brien.[7]

The court granted the motion to disqualify, finding "the ethical breach . . . too significant" and "the potential for conflict . . . too great." With respect to the

---

[7] When Bourne made the motion, Marshall asked if she could "fire" her attorney. The court subsequently conducted a hearing to determine whether a conflict between Marshall and her counsel existed. (See *People v. Marsden* (1970) 2 Cal.3d 118.)

conflict, the court stated: "[H]ypothetically, if Ms. Marshall were to testify in this case . . . to something that turns out inconsistent with what she told [O'Brien], [O'Brien has] then made [her]self a witness in this case." The court further stated that "[appellant's] right to counsel of his choice has to yield to the codefendant's right to [a] fair trial and to the . . . integrity of the process and the integrity of the bench and the bar."

### 2. *Analysis*

"The Sixth Amendment provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence.'. . . [A]n element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him." (*U.S. v. Gonzalez-Lopez* (2006) 548 U.S. 140, 144.) As the Supreme Court explained, "[the Sixth Amendment] commands, not that a trial be fair, but that a particular guarantee of fairness be provided -- to wit, that the accused be defended by the counsel he believes to be best." (*Id.* at p. 146.) "Deprivation of the right is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received." (*Id.* at p. 148.) Accordingly, erroneous deprivation of the right to counsel of choice is structural error requiring per se reversal. (*Id.* at p. 150.)

The Sixth Amendment right to chosen counsel is not absolute, and can be abrogated to serve a "'compelling purpose,'" such as "[e]nsuring the ethical and orderly administration of justice . . . ." (*U.S. v. Ries* (9th Cir. 1996) 100 F.3d 1469, 1471.) The Supreme Court has said that courts "have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them," which in some circumstances supersedes a defendant's right to counsel of his or her

choice.  (*Wheat v. U.S.* (1988) 486 U.S. 153, 160.)  The Court has further recognized that trial courts have "wide latitude in balancing the right to counsel of choice against the needs of fairness."  (*U.S. v. Gonzalez-Lopez, supra*, 548 U.S. at p. 152.)  Our state Supreme Court has said that although the state should keep to a minimum "its interference with the individual's desire to defend himself in whatever manner he deems best, using any legitimate means within his resources," that desire "can constitutionally be forced to yield only when it will result in significant prejudice to the defendant himself or in a disruption of the orderly processes of justice unreasonable under the circumstances of the particular case."  (*People v. Crovedi* (1966) 65 Cal.2d 199, 208; accord, *People v. Ramirez* (2006) 39 Cal.4th 398, 422; *People v. Baylis* (2006) 139 Cal.App.4th 1054, 1071.)

"A judge's authority to disqualify an attorney has its origins in the inherent power of every court in the furtherance of justice to control the conduct of ministerial officers and other persons in pending judicial proceedings."  (*Oaks Management Corp. v. Superior Court* (2006) 145 Cal.App.4th 453, 462, quoting *Neal v. Health Net, Inc*. (2002) 100 Cal.App.4th 831, 840.)  "Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion."  (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc*. (1999) 20 Cal.4th 1135, 1143.)  However, "the trial court's discretion is limited by the applicable legal principles."  (*Id*. at p. 1144; see *Koo v. Rubio's Restaurants, Inc*. (2003) 109 Cal.App.4th 719, 733 ["In exercising [its] discretion [to grant or deny a motion to disqualify], the trial court is required to make reasoned judgments which comply with legal principles and policies."].)  Consequently, "a disqualification motion involves concerns that justify careful review of the trial court's exercise of discretion."  (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc*., *supra*, at p. 1144.)  "If the trial court resolved disputed factual issues, the

9

reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence." (*Id*. at p. 1143.)

There is no dispute that appellant's former counsel violated rule 2-100 of the Rules of Professional Conduct, which provides: "While representing a client, a member shall not communicate directly or indirectly about the subject of the representation with a party the member knows to be represented by another lawyer in the matter, unless the member has the consent of the other lawyer." Rule 2-100 "'was designed to permit an attorney to function adequately in his proper role and prevent the opposing attorney from impeding his performance in such role.'" (*Chronometrics, Inc. v. Sysgen, Inc*. (1980) 110 Cal.App.3d 597, 607.) It "'is necessary to the preservation of the attorney-client relationship and the proper functioning of the administration of justice . . . .'" (*San Francisco Unified School District ex rel. Contreras v. First Student, Inc*. (2013) 213 Cal.App.4th 1212, 1230 (*Contreras*)), and its willful breach may warrant disciplinary action against the culpable attorney by the State Bar. (See *Continental Ins. Co. v. Superior Court* (1995) 32 Cal.App.4th 94, 111, fn. 5.) However, "'the "business" of the court is to dispose of "litigation" and not to oversee the ethics of those [who] practice before it unless the behavior "taints" the trial.'" (*Ibid*.) Accordingly, a trial court's goal when faced with a violation of rule 2-100 is not to impose a penalty (*Continental Ins. Co. v. Superior Court*, *supra*, at p. 111, fn. 5; *Myerchin v. Family Benefits, Inc*. (2008) 162 Cal.App.4th 1526, 1538, disapproved on other grounds in *Village Northridge Homeowners Ass'n. v. State Farm Fire & Cas. Co*. (2010) 50 Cal.4th 913), but to determine whether confidential information, or any other information which could create an unfair advantage or impact the fairness of trial or the integrity of the judicial system, has been obtained as a result of the misconduct. (*Continental Ins. Co. v. Superior Court*, *supra*, at p. 111, fn. 5.) If so, the court must then focus on "identifying an appropriate remedy for whatever improper

10

effect the attorney's misconduct may have had in the case before it." (*Myerchin v. Family Benefits, Inc.*, *supra*, 162 Cal.App.4th at p. 1538, italics omitted; accord, *Contreras*, *supra*, 213 Cal.App.4th at p. 1231.) The court may exclude improperly obtained evidence or "take other appropriate action to achieve justice and ameliorate the effect of improper conduct," up to and including disqualification of counsel. (*Triple A Machine Shop, Inc. v. State of Calif.* (1989) 213 Cal.App.3d 131, 144; see *Rico v. Mitsubishi Motors Corp.* (2007) 42 Cal.4th 807, 819 [disqualification appropriate remedy because of unmitigable damage caused by dissemination and use of confidential information].)

Appellant contends the court could have ameliorated the effects of his counsel's improper conduct short of disqualifying her by excluding evidence or ordering that Marshall be tried separately. While exclusion of evidence may be an appropriate remedy in a civil trial where opposing counsel has conferred with a party (see *Triple A Machine Shop, Inc. v. State of Calif.*, *supra*, 213 Cal.App.3d at p. 144) or in a criminal case where the prosecutor has obtained information in an improper fashion (see *U.S. v. Hammad* (2d Cir. 1988) 858 F.2d 834, 842), appellant and Marshall were criminal codefendants. The court could not exclude relevant evidence that might be helpful to the defense in a criminal matter. Moreover, the court was constrained in its ability to make the inquiries required to determine the exact nature of the information obtained in order to fashion a suitable order. O'Brien had questioned Marshall about her whereabouts just prior to the loft burglaries in an apparent attempt to obtain information that would have provided an innocent explanation for appellant's activities. But any information from Marshall indicating she had accompanied appellant to the lofts would likely have incriminated her, undercutting her Fifth Amendment rights in a setting in which she was not protected by the attorney-client privilege. A hearing to determine exactly what was said during the interview would only have exacerbated

11

the problem by placing Marshall's answers on the record. The court was further constrained in its ability to determine an appropriate remedy short of disqualification by its doubts concerning O'Brien's credibility, due to her initial assertions that she had spoken to Marshall only briefly and could not recall what had been discussed.

Nor can we agree that ordering separate trials would have been a reasonable response. Separate trials add unnecessary time and expense and are inconvenient for the witnesses and the court.[8] Moreover, separate trials would not necessarily have alleviated the conflict that existed. Appellant contends there was no serious potential for a conflict of interest because the information his former counsel sought "would have been to the mutual benefit of Marshall and appellant," and because Marshall might have chosen not to testify or might have testified in accordance with what she told O'Brien. This begs the question. The court was not required to credit O'Brien's changing account of her unauthorized contact with Marshall, much less defer to her assessment of its utility for Marshall's defense. Nor was the court required to speculate as to whether or how Marshall would testify.[9] Moreover, as it appears appellant took the lead in testing doors and entering the victim's lofts, any innocent explanation for Marshall's behavior was unlikely to inure to the benefit of appellant and could well have implicated him further. If Marshall testified in a way that implicated appellant and exonerated herself, O'Brien would likely have been required to testify, acting as both advocate and witness to the confusion of the jury. (See *People v. Donaldson* (2001) 93

---

[8]      As noted, at the time of the motion, appellant and Marshall were set to be tried together.

[9]      As noted, Marshall's own counsel, Bourne, after talking with her client and with a superior knowledge of her anticipated defense, made a determination of the risk posed to her client and sought O'Brien's disqualification.

Cal.App.4th 916, 928, 930 [acting as both advocate and witness "'is a situation to be avoided if possible,'" as it may cause "'confusion over the lawyer's role,'" which could "prejudice one or more of the parties or call in to question the impartiality of the judicial process itself"].) In view of the real possibility of a conflict arising and with no clear way to ameliorate short of disqualification, the court did not abuse its discretion in ordering O'Brien to step down.

### B. *Motion to Sever*

#### 1. *Background*

Appellant's counsel moved to sever counts one through three (the charges related to the coins and the briefcase) from counts four through six (the charges related to the lofts). Appellant contended the evidence supporting the commercial burglary was substantially stronger, as he was found in possession of the stolen property and his handprint was left at the scene of the crime. He argued that trying the counts together would confuse the jury, particularly with respect to the intent to steal element of the residential burglary charges. The prosecution argued there was no good cause for severance given the law's preference for joinder, but did not suggest that the evidence pertaining to the commercial burglary was cross-admissible under Evidence Code section 1101 to establish intent in support of the loft burglary charges.

At a pretrial hearing, the court denied the motion, stating that a reasonable jury would not be "so overwhelmed by the evidence" that it would not see the weaknesses in the case or be able to "sort those things out." The motion to sever was renewed before the trial judge, who found joinder appropriate because each count was within the same class of crimes and occurred within a few days of each other, and concluded the evidence pertaining to the burglary of the gold coins was not "more prejudicial" or likely to "overcome the jury's decision-making process."

13

During closing argument, the prosecutor acknowledged that "the real issue as to the residential burglaries" was appellant's intent. He initially advised the jury to "isolate [and] put . . . to the side" that appellant had just committed the commercial burglary and "just look at the facts as to residential burglary." He asserted that appellant's intent was inferable from the video showing appellant and his companion waiting by a pillar for someone else to gain entry to the building and entering "[i]n a very secretive and quick fashion . . . ." He argued that "[t]she manner in which [appellant] conducted each of [the loft] entries indicate[d] that he was there to steal," including failing to knock and failing to apologize or explain his intrusion, as well as the fact that he continued to enter one loft after another until someone screamed, and never spoke with any of the residents or asked for directions. He later repeated his suggestion that the jury "look at [the loft entry] in its own bubble aside from the commercial burglary and theft of the coins, in its own little universe," but then stated that was "not how you need to look at it," and also argued: "Let's not look at it in a bubble. Let's look at it with what we know about [appellant]. We know that once he gained entry into somewhere where there was no person present, he stole. And . . . he did it . . . within five days."

Defense counsel argued, based on the instructions given, that the jurors "must consider each count separately and return a separate verdict for each one," and further contended that "the People have not proved beyond a reasonable doubt that [appellant] had the specific intent to steal when he entered the lofts." On rebuttal, the prosecutor stated: "I can say . . . why don't you just look at the commercial burglaries and the grand theft to infer intent for the residential burglary. There's no principal of law that says I can't do that . . . ." He further said: "I'm not asking you [to] . . . isolate everything individually instead of looking at it, like common sense and logic would dictate, as a whole picture. So

14

even if I'm just saying look at the commercial burglary to infer intent to the residential burglary, that's proper for me to do that."

### 2. *Analysis*

Section 954 permits joinder of different offenses "'"if there is a common element of substantial importance in their commission, for the joinder prevents repetition of evidence and saves time and expense to the state as well as to the defendant."'" (4 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Pretrial Proceedings, § 208, p. 412, quoting *People v. Scott* (1944) 24 Cal.2d 774, 778.) "[A]n accusatory pleading may charge two or more different offenses so long as . . . [t]he offenses are (1) 'connected together in their commission,' or (2) 'of the same class.'" (*People v. Soper* (2009) 45 Cal.4th 759, 771, quoting § 954 (*Soper*).) Appellant does not dispute that the counts were properly joined under section 954, but contends the court erred in denying his motion to sever the first three counts from the remaining three counts. For the reasons discussed, we disagree.

"'"'A defendant, to establish error in a trial court's ruling declining to sever properly joined charges, must make a '"clear showing of prejudice to establish that the trial court abused its discretion . . . ."'"'" (*Soper*, *supra*, 45 Cal.4th at p. 774, quoting *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220.) "In determining whether a trial court abused its discretion under section 954 in declining to sever properly joined charges, 'we consider the record before the trial court when it made its ruling.'" (*Soper, supra,* at p. 774.) We begin by considering the cross-admissibility of the evidence under Evidence Code section 1101 in a hypothetical trial. (*Ibid.*) "If the evidence underlying the charges in question would be cross-admissible, that factor alone is normally sufficient to dispel any suggestion of

15

prejudice and to justify a trial court's refusal to sever properly joined charges." (*Id*. at pp. 774-775.)[10]

Section 1101 of the Evidence Code permits the admission of evidence of uncharged misconduct to establish a fact other than the person's character or disposition, including intent, plan, identity, and absence of mistake or accident. "'In proving intent, the act is conceded or assumed; what is sought is the state of mind that accompanied it.' (2 Wigmore[ Evidence] (Chadbourn rev. ed. 1979) § 300, p. 238.) For example, in a prosecution for shoplifting in which it was conceded or assumed that the defendant left the store without paying for certain merchandise, the defendant's uncharged similar acts of theft might be admitted to demonstrate that he or she did not inadvertently neglect to pay for the merchandise, but rather harbored the intent to steal it." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 394.) Appellant's intent to steal was at issue with respect to counts three through six because he left the lofts without taking anything. (See *People v. Rodriguez* (2004) 122 Cal.App.4th 121, 131 ["Burglary is defined as entry into a building or certain structures and vehicles 'with intent to commit grand or petit larceny or any felony.'"].) The evidence that a few days earlier, he had entered Chang's office and stole the gold coins supported the existence of the requisite intent to steal on the other occasions.

Appellant contends the crimes were too dissimilar to support cross-admissibility. As explained in *People v. Ewoldt*, "[t]he least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent." (*People v. Ewoldt, supra*, 7 Cal.4th at p. 402.) In order to be cross-admissible to prove intent, the evidence of the other crime "must be sufficiently

---

[10] Although the prosecution did not oppose appellant's severance motion on the ground that the evidence in the first three counts was cross-admissible to support the remaining counts, the parties address this issue on appeal.

similar to support the inference" that the defendant ""probably harbor[ed] the same intent in each instance." [Citations.]'" (*Ibid*.) Here there were a number of similar elements. The three loft residents testified that appellant opened their unlocked doors and immediately withdrew when he realized the premises were occupied. There was no evidence of a break-in at the health food store, and Chang testified that the back door was regularly left unlocked. He was unaware of the unauthorized entry and had no notion that the coins had been taken until visited by the investigators. The evidence supported that appellant opportunistically entered unlocked premises for purposes of theft when he believed no one was there. A potentially significant difference was that counts one through three related to burglaries of commercial establishments and counts four through six involved burglaries of residences. However, the evidence further established that there was a restaurant on the ground floor of the lofts and that the name of the building -- Biscuit Company Loft Building -- suggested a commercial enterprise. Significantly, appellant stated in his first recorded telephone conversation that the building appeared to contain businesses. Accordingly, the evidence supporting counts one through three was admissible to show appellant's intent with respect to counts four through six.

Even were we to conclude otherwise, we would not find reversible error. Our Supreme Court has stated that "the circumstance that evidence underlying [the] charges would not be cross-admissible at hypothetical separate trials is, *standing alone, insufficient* to establish that a trial court abused its discretion in failing to sever those charges." (*Soper*, *supra*, 45 Cal.4th at pp. 779-780.) If the reviewing court determines that the evidence underlying properly joined charges would not be cross-admissible, it must proceed to consider "'whether the benefits of joinder were sufficiently substantial to outweigh the possible "spill-over" effect of the "other-crimes" evidence on the jury in its consideration of the evidence of

17

defendant's guilt of each set of offenses.'" (*Soper*, *supra*, at p. 775.) The court explained that the benefits of joinder were tangible and substantial: "'A unitary trial requires a single courtroom, judge, and court attach[és]. Only one group of jurors need serve, and the expenditure of time for jury voir dire and trial is greatly reduced over that required were the cases separately tried. In addition, the public is served by the reduced delay in disposition of criminal charges both in trial and through the appellate process.'" (*Soper*, *supra*, 45 Cal.4th at p. 772.) It further stated that a court, including an appellate court, errs when it fails to take into account "the circumstances that, as a general matter, a single trial of properly joined charges promotes important systemic economies," including one track for discovery and other pretrial matters, one set of prospective jurors, and one appeal and record. (*Id.* at at pp. 772, 782.) In view of these clear benefits, a heavy burden is imposed on the defendant "'to persuade the court that these countervailing considerations are outweighed by a substantial danger of undue prejudice.'" (*Id*. at p. 773, italics omitted.)[11]

As applicable here, the specific factors to be considered in determining prejudice include "(1) whether some of the charges are particularly likely to inflame the jury against the defendant; [and] (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges . . . ." (*Soper*, *supra*, 45

---

[11] The court went on to explain: "Although our courts work diligently to ensure due process in all proceedings, their resources are limited. California's trial courts in particular face ever-increasing civil and criminal dockets without any guarantee of corresponding, additional funds for court services -- judges, judicial staff, and clerk's office personnel -- to meet the demand. Today, no less than in the past, the opportunity for joinder with its attendant efficiencies provided by section 954 is integral to the operation of our public court system. Manifestly, severance of properly joined charges denies the state the substantial benefits of efficiency and conservation of resources otherwise afforded by section 954." (*Soper*, *supra*, 45 Cal.4th at p. 782.)

18

Cal.4th at p. 775.) Here, the evidence for neither set of charges was likely to inflame the jury. The evidence overall suggested that appellant operated in a manner that was nonviolent, non-confrontational and non-destructive, as it supported that he slipped into and out of Chang's office without being noticed, entered only unlocked doors, and left if the premises were occupied. Moreover, we cannot agree that counts four through six were substantially weaker than the first three counts, even with respect to intent. Appellant was caught on video waiting for the outer security door to be opened by workmen and entering the building surreptitiously. Once inside, he opened three different doors in quick succession and offered neither an apology nor an innocent explanation for his actions when observed by the occupants. He left when Jennings screamed. Afterward, he was overheard instructing his female callers to get rid of the clothing he was wearing in the video and speculating as to whether there was sufficient evidence to sustain a conviction for burglary. On this record, we conclude that the trial court did not abuse its discretion in determining that the prospect of prejudice was outweighed by the substantial benefits of joinder, and in denying the motion to sever.

Even if the trial court's ruling denying severance was correct when made, a reviewing court must determine whether, in the end, the trial was conducted in such a way as to result in gross unfairness, depriving the defendant of due process of law. (*Soper*, *supra*, 45 Cal.4th at p. 783.) Although the jury was not specially instructed to restrict its consideration of the evidence of appellant's intent to the evidence pertaining to each charge and the prosecutor blurred the distinction between the charges in closing argument, these factors, standing alone, do not establish gross unfairness depriving defendant of due process as a matter of law. (*Id*. at pp. 783-784.) Where, as here, the evidence underlying the separate charges or sets of charges is "straightforward and distinct" and "independently ample to

19

support [the] defendant's conviction of both crimes," there is no "great disparity in the nature of the two charges," the jury is correctly instructed on the element of the charges and the burden of proof for conviction, and the jury is told that each count charged is a distinct offense that must be separately decided, "the risk of any prejudicial spillover" is mitigated. (*Id*. at p. 784.) The jury here was clearly able to follow instructions and compartmentalize the evidence presented, as it found appellant not guilty of any crime with respect to the briefcase. We conclude that viewed as a whole, appellant received a fair trial.

    C. *Conviction of Theft and Receipt of the Stolen Coins*

Appellant was charged with and convicted of grand theft of the gold coins in count two and of receiving stolen property in count three. Although the charge in count three pertained to both the coins and Sok's stolen briefcase, the jury specifically found appellant not guilty with respect to the briefcase. Accordingly, he was convicted of theft and receipt of the gold coins. Respondent concedes appellant cannot stand convicted of stealing and receiving the same property, and that the conviction of receiving stolen property must therefore be reversed. We agree. (See § 496; *People v. Allen* (1999) 21 Cal.4th 846, 857; *People v. Recio* (2007) 156 Cal.App.4th 719, 723.)

**DISPOSITION**

The conviction on count two for receipt of stolen property shall be reversed. In all other respects, the judgment is affirmed. The superior court is directed to prepare an amended abstract of judgment and to forward a copy to the Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, J.


We concur:


WILLHITE, Acting P. J.


SUZUKAWA, J.